UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 06-10004-RGS

JAMES A. BUNCHAN

v.

UNITED STATES OF AMERICA

MEMORANDUM AND ORDER ON
PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE

July 25, 2011

STEARNS, D.J.

James Bunchan, proceeding *pro se*, brings this petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Bunchan presents two arguments: (1) that he was convicted of mail fraud under a statute that has since been held unconstitutionally vague[1]; and (2) that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment. For the reasons stated, Bunchan's petition will be *DENIED*.

BACKGROUND

On June 27, 2007, following a three-week jury trial, Bunchan was convicted of one count of conspiracy (18 U.S.C. § 371), sixteen counts of mail fraud (18 U.S.C. § 1341), and fifteen counts of engaging in monetary transactions in proceeds of specified unlawful activity (18 U.S.C. § 1957) (money laundering). The charges arose from a

---

[1] In *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court pruned back the reach of the mail fraud statute by limiting prosecutions proceeding under a theory of a deprivation of "the intangible right of honest services" to cases involving bribery and kick-backs. As will be explained, Bunchan was charged, prosecuted, and convicted under an entirely different statutory theory.

multi-million dollar fraud scheme originated by Bunchan as the founder and owner of World Marketing Direct Selling (WMDS) and Oneuniverseonline (1UOL). With the help of his co-conspirators[2], Bunchan by playing on ethnic affinity and a history of shared suffering gulled hundreds of fellow first-generation Cambodian-Americans (many of whom were survivors of the atrocities of the Khmer Rouge) into believing that WMDS and 1UOL were legitimate franchises of the American Dream.[3] Specifically, Bunchan represented that WMDS and 1UOL generated revenue (and healthy profits) by selling health and diet supplements – and paid generous commissions and bonuses to participant-investors based on these sales. In realty, WMDS and 1UOL were classic Ponzi schemes, "simply paying [earlier] investors with funds supplied by other, later, investors." Opp'n at 8. At trial, the government's evidence showed that the scheme had generated at least $26 million over the course of five years. While approximately $12 million of that total was paid out to investors on a monthly basis, the remaining $14 million was left to Bunchan and the others to spend at their whim.[4]

---

[2] Among the principals were Christian Rochon (who as the ostensible Chairman of the enterprise contributed a reassuring North American face decked out in a respectable business suit that Bunchan had purchased) and Seng Tan, a woman with an authentic story of abuse at the hands of the Khmer Rouge, who served as the President and Director of Marketing of the Bunchan conglomerate. Bunchan and Seng Tan were tried together, and, on June 27, 2007, were convicted by the jury. Rochon pled guilty prior to trial and testified against Bunchan and Seng Tan.

[3] In exchange for a lump-sum "investment" of $26,000, investors were promised a life-long stream of returns ($300 a month) that their children would inherit. Ex. 322. For a larger investment – usually ranging from $130,000 to $160,000 – investors were promised a monthly payment of $2,500. Ex. 354,363.

[4] According to Special Agent Troy Niro of the Internal Revenue Service (IRS), at least $4.76 million was dissipated in documented personal expenses; the remainder could not be reliably traced. Dkt. # 198 at 64-73. Of the documented expenditures, at least $3.8 million was spent by Bunchan at casinos. Ex. 918, 919. Seng Tan spent thousands of dollars on expensive clothing. Ex. 915. Rochon received free rent of his car and apartment, as well as gambling trips to Las Vegas. Ex. 914.

On November 28, 2007, the court sentenced Bunchan to a total of 420 months in prison, followed by two years of supervised release.[5]  Specifically, Bunchan was sentenced to 240 months on the mail-fraud counts (Counts 2 through 14), to run consecutively to concurrent 120-month sentences on each of the fourteen counts of money laundering (Counts 26 through 40).  Bunchan was additionally sentenced to a term of 60 months on the conspiracy count (Count 1), as well as on another mail-fraud count (Count 19), to be served consecutively to the terms imposed on Counts 2 through 14, and Counts 26 through 40.

Bunchan filed a timely notice of appeal challenging his conviction and his sentence.  Before the First Circuit Court of Appeals, Bunchan argued that the district court erred: (1) in restricting his impeachment of the credibility of Rochon's testimony with an alleged prior bad act; and (2) imposing an unreasonably lengthy sentence of 35 years in prison.  On September 2, 2009, the Court of Appeals affirmed the convictions and sentence, rejecting both of Bunchan's appellate arguments.  *See United States v. Bunchan*, 580 F.3d 66 (1st Cir. 2009).

The Court of Appeals concluded that: (1) the district court did not abuse its discretion in denying Bunchan's request to inquire into the nature of Rochon's pending charges in state court, since doing so was "not necessary to establish the potential of bias resulting from Rochon's expectations [of receiving lighter treatment in state court by testifying against Bunchan]," *id.* at 71; and (2) the sentence imposed by the district

---

[5] The court also issued a restitution order in the amount of $13,728,985.52 to be paid jointly and severally by Bunchan with Seng Tan and Rochon.  On February 14, 2008, the judgment was amended to increase the amount of restitution to be paid by Bunchan, jointly and severally with his co-defendants, to $19,103,121.73.  Dkt. # 189.

3

court was not unreasonable, given (a) the enormity of the harm caused by Bunchan, (b) the lack of any remorse on Bunchan's part, and (c) that the court had agreed with the government in departing downward from the recommended Guideline sentence of life in prison. *Id*. at 72-73. Bunchan filed a petition for certiorari with the Supreme Court, which was denied on October 13, 2009.

In March of 2007, a second federal grand jury indicted Bunchan for crimes he had committed while detained in the Plymouth County Correctional Facility waiting trial in this court, namely: (1) using a facility of interstate commerce in the commission of a murder for hire, in violation of 18 U.S.C. § 1958, and (2) solicitation of a crime of violence, in violation of 18 U.S.C. § 373. *See United States v. Bunchan*, 626 F.3d 29 (1st Cir. 2010). In May of 2006, Bunchan had asked a fellow inmate if he knew anyone who could murder a government witness slated to testify at his trial. *Id*. The inmate reported the request to the FBI, and agreed to become a cooperating witness. *Id*. On two separate occasions, Bunchan was recorded on video and audio tape discussing the details of the plan, including a list of the intended victims (among them the prosecutor in his case). On April 27, 2009, Bunchan was convicted and sentenced to twenty-five years of imprisonment for these crimes – twenty of which are to be served consecutively to the instant 420-month sentence. Bunchan challenged his conviction and sentence on appeal; the First Circuit affirmed the district court judgment on November 24, 2010.

Bunchan brought this section 2255 habeas petition on October 26, 2010. The United States filed an opposition on January 26, 2011. On April 1, 2011, Bunchan filed a reply.

DISCUSSION

Section 2255 is not a substitute for direct appeal, but rather provides post-conviction relief in four limited instances: "if the petitioner's sentence was (1) imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998). "The catch-all fourth category includes only assignments of error that reveal 'fundamental defect[s]' which, if uncorrected, will 'result[ ] in a complete miscarriage of justice,' or irregularities that are 'inconsistent with the rudimentary demands of fair procedure.'" *Id.*, quoting *Hill v. United States*, 368 U.S. 424, 428 (1962). In other words, a cognizable Section 2255 claim that does not raise constitutional or jurisdictional issues must reveal "exceptional circumstances" that compel redress. *Id.* The petitioner bears the burden of demonstrating an entitlement to relief. *Mack v. United States*, 635 F.2d 20, 26-27 (1st Cir. 1980).

**The Implications of *Skilling* for Bunchan's Mail-Fraud Convictions**

Bunchan argues that his "convictions for mail-fraud must be vacated as they were based upon an unconstitutionally vague statute, as put forth by the decision in *Skilling*. . . ." Pet'r's Reply at 1. Central to this claim is Bunchan's mistaken impressions that he was convicted of mail-fraud under the same theory as Skilling, that is, "[the] fraudulent deprivation[] of 'the intangible right of honest services,'" *Skilling,* 130 S.Ct. at 2907, and that the Supreme Court in *Skilling* deemed the mail fraud statute , as a whole, to be unconstitutionally vague.

5

Wholly apart from Bunchan's misapprehension of the holding in *Skilling*,[6] he was not charged with – much less, convicted of – committing mail-fraud under a deprivation of honest-services theory. Rather, "the indictment explicitly charged Bunchan with traditional *property rights based violation[s]* of the mail-fraud statute under 18 U.S.C. § 1341." Opp'n at 20 (emphasis added). Indeed, the Second Superseding Indictment makes no mention of the term "honest services" or makes any other reference to section 1346. Instead, it describes the target offense as a "scheme to defraud and to *obtain money* by false and fraudulent pretenses." Dkt. # 65 ¶ 8 (emphasis added).[7] Nor at trial was any request made for a jury instruction on honest services nor any given. This ground of Bunchan's petition fails without further discussion.

**Ineffective Assistance of Counsel**

Bunchan next contends that he did not receive constitutionally effective assistance from his counsel at trial, Robert A. George, or from his counsel on appeal, James A. Fox. Bunchan makes three claims in this regard: (1) George failed to call three witnesses at trial who would have offered allegedly exculpatory testimony; (2)

---

[6] The Court explicitly refused Skilling's request to void section 1346 as unconstitutionally vague. *Skilling*, 130 S.Ct. at 2927-2935.

[7] Section 1341 criminalizes the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises." (Emphasis added). The completely separate honest services portion of the statute provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of *the intangible right of honest services*." (Emphasis added). The text of both sections 1341 and 1346 reflects a long history of court decisions as well as legislation, that lay out two broad theories under which mail-fraud prosecutions may proceed: (1) the traditional property-based theory - which includes schemes or artifices that seek to obtain money *as well as* property - and (2) the honest services theory. *See Id*. at 2925-2928.

6

George failed to obtain an interpreter to facilitate their attorney-client discussions; and (3) Fox failed to raise an issue on appeal concerning the district court's denial of Bunchan's request for a continuance of the sentencing hearing.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defence." The right to counsel includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Effective counsel does not mean perfect counsel. "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [should] be made to eliminate the distorting effects of hindsight." *Id.* at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). "First, a reviewing court must assess the proficiency of counsel's performance under prevailing professional norms. . . . This evaluation demands a fairly tolerant approach; after all, the Constitution pledges to an accused an effective defense, not necessarily a perfect defense or a successful defense. . . . The second line of inquiry . . . entails a showing of a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Scarpa v. Dubois*, 38 F.3d 1, 8 (1st Cir. 1994) (internal quotation marks omitted).

To satisfy the first prong of the *Strickland* test, Bunchan must prove that his counsel's performance was so deficient as to have been objectively unreasonable. *See United States v. McGill*, 11 F.3d 223, 226 (1st Cir. 1993). Counsel's conduct is

considered reasonable if it falls "'within the range of competence demanded of attorneys in criminal cases.'" *United States v. Bosch*, 584 F.2d 1113, 1121 (1st Cir. 1978), quoting *McMann v. Richardson*, 397 U.S. 759, 770-771 (1970).

To satisfy the second *Strickland* prong, Bunchan must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. While Bunchan is not required to prove that his counsel's deficient conduct more likely than not altered the result, he must show that his counsel's errors "had some conceivable effect on the outcome of the proceeding." *Id*. at 693. *See also Dugas v. Coplan*, 506 F.3d 1, 9 (1st Cir. 2007).

*Failure to Call Witnesses*

Bunchan argues that George failed to call three witnesses at trial who would have provided exculpatory testimony: (1) Gerald Durochea, an accountant; (2) Jack Smith, an attorney; and (3) Byron Taylor, another attorney. According to Bunchan, Durocheas's testimony would have shown that Rochon had grossly exaggerated his involvement in the criminal aspects of the scheme to forestall prosecution for child molestation in the state court. In its gist, the argument is an attempt to resuscitate the argument rejected by the Court of Appeals on direct appeal[8]. *See Bunchan*, 580 F.3d at 71-72. Before the First Circuit, Bunchan's appellate counsel (Fox) argued that "[Bunchan] was deprived of a fair trial because the district court erroneously restricted

---

[8] Bunchan asserts that Durochea's testimony would have had an outcome-changing domino-effect on the credibility of witnesses lined up in support of Rochon's testimony: "If Rochon lied, those. . .witnesses. . .must also have been untruthful. With [the jury observing] untruthful witness after untruthful witness testifying against [Bunchan], at some point the scales would certainly have tipped toward a not guilty finding in this case." Pet'r's Reply at 4-5.

his impeachment of a witness against him, Christian Rochon." *Id*. at 71. However, as the First Circuit pointed out,

> the district court permitted appellant to examine Rochon about the pending state court assault charges but ordered that he could not inquire into the nature of the charges. . . . We find no abuse of discretion in [this ruling]. . . . [which] allowed appellant to raise the possibility that Rochon had a motive to ingratiate himself with the government by testifying against appellant. Appellant inquired into whether Rochon perceived that he would receive lighter treatment on the state charges if he testified favorably for the government. Exposing the nature of the pending state charges was not necessary to establish the potential of bias resulting from Rochon's expectations.

*Id*. Abiding in the first instance by the district court's ruling, Bunchan's counsel at trial (George) established on cross-examination that Rochon was facing assault charges in state court, Dkt. # 196 at 141-142, and that the charges had been lodged after his arrest for involvement in the pyramid-scheme. *Id*. at 142. George then attempted to expand the impeachment line of questioning even further, and repeatedly stated his objections on the record when those efforts were rebuffed. *Id*. at 136, 143-144. In view of these facts, Bunchan has failed to make any plausible showing that by calling Durochea to the stand, George would have persuaded the district court to change its consistent rulings on the subject of impeachment, much less in any way that would have exonerated Bunchan.

The result is the same with respect to George's decision to forego the testimony of the two attorney-witnesses, Smith and Taylor. The only facts that these witnesses would have added to the mix would have simply buttressed the evidence of the sophistication of the scheme by underscoring the extent to which Bunchan sought to legitimatize the existence of WMDS and 1UOL by having attorneys prepare

9

incorporation documents[9] and formal-looking contracts and agreements.[10] As the government points out, "Bunchan's conviction for fraud did not depend on whether the theoretical legal framework for WMDS and 1UOL complied with multi-level marketing law. Bunchan's convictions arose from his decision . . .to convert [those companies] into an outright Ponzi scheme." Opp'n at 26.[11]

*Failure to Obtain an Interpreter*

Bunchan next contends that, despite his request, George failed to obtain the services of an interpreter to facilitate their attorney-client discussions. Pet'r's Mot. at 8. This failure, Bunchan maintains, prevented him from "being [able] to understand the evidence against [him] and what evidence [was] needed to mount a defense." Pet'r's Reply at 6. While a defendant's inability to communicate with his counsel because of

---

[9] In his petition, Bunchan asserts that Smith would have testified "that he prepared all necessary legal work for [WMDS] to operate legally in the United States." Pet'r's' Mot. at 6.

[10] Bunchan claims in his petition that Taylor would have also testified as to the legality of WMDS' "trading." *Id.* Yet, as the government observes, "it is not at all clear what Bunchan means by the term. . . . Even as originally created WMDS was not in the business of trading. It was (or purported to be) a sales and marketing organization." Opp'n at 27.

[11] Bunchan appears to raise a general "good faith" argument in his reply, *see* Pet'r's Reply at 5, but it is unclear if he claims – or even understands – the (more specific) "advice of counsel" defense. As far as the court can discern, Bunchan conflates the two by implying that *any* job-related action taken in good faith entitles him to the defense: "[the proposed testimony of Smith and Taylor] would certainly have shown that the Petitioner acted in good faith, attempting to perform in a legal manner his professional duties. [. . . .] If Petitioner sough[t] to engage in illegal activity, then why bother to insure that he complied with the nuances of corporate law that could only be navigated by an attorney?" *Id.* To the extent that Bunchan is attempting to assert a late-blooming advice of counsel defense it has no merit. A defendant claiming an "advice of counsel" defense must establish three elements: (a) that the defendant honestly and in good faith sought the advice of a lawyer as to what he may lawfully do; (b) that he fully and honestly laid all the facts before his lawyer; and (c) that in good faith he honestly followed such advice, relying upon it and believing it to be correct. *See* 1 L. San, *et al.*, *Modern Federal Jury Instructions: Criminal*, ¶ 8.04 (2006). Bunchan, however, has not even met the threshold; he has not claimed that either Smith or Taylor would have testified that Bunchan "made full – or indeed, *any* – disclosure of the critical aspects of the scheme. . . . [Or that either attorney] ever gave advice to Bunchan [concerning those critical aspects] . . .let alone that Bunchan followed such advice." Opp'n at 28 (emphasis added).

10

a language barrier might render the attorney's assistance constitutionally ineffective, *see Gallo-Vasquez v. United States*, 402 F.3d 793, 799 (7th Cir. 2005), citing *Granada v. United States*, 51 F.3d 82, 85 (7th Cir. 1995), Bunchan has failed to show that a language barrier – if any – existed between himself and George. If one did, Bunchan had multiple opportunities (with interpreters present who alternated between French and Khmer at his request) to raise the issue – at pretrial hearings, during trial, at sentencing, or on direct appeal – but he failed to do so.[12]

By his own admission, Bunchan speaks and understands English as his second-language. Pet'r's Mot. at 8. He claims now that he has difficulty (as do many native English speakers) in understanding when English is spoken quickly and he is not given the opportunity to ask the speaker to repeat what has been said. *Id*. While it might be possible *for a court* to make a judgment as to a defendant's understanding of the flow of proceedings in a jury trial, it has no way of gauging the linguistic qualities of an *attorney's* conduct of private discussions with his client. What the court knows from public proceedings is that at the sentencing hearing for the murder-for-hire conviction, Bunchan "read into the record, in English, a lengthy letter he had drafted, in English." Opp'n at 30; *see also* Dkt. # 298 at 34-35. In appealing this sentence *pro se*, Bunchan also drafted both his 2255 petition as well as his reply to the government's opposition in perfectly understandable English. The court can imagine any number of reasons why

---

[12] At the sentencing hearing, for example, Bunchan was reminded on at least three occasions of his right to be heard, Dkt. # 298 at 2, 33, 52, and was provided *two* separate opportunities to address this court – the latter of which followed a 30-minute recess granted for the express purpose of allowing Bunchan to "compose any thoughts he wants to express to the Court. . . ." *Id*. at 39. In both instances, however, Bunchan failed to mention anything about the alleged language-barrier that was purportedly preventing communication between himself and George. *Id*. at 34-35, 52-54.

George would have preferred to conduct his private conversations with his client one-on-one rather than through the filter of an interpreter; Bunchan has given no reason for the court to second-guess George's decision.

*Failure to Raise on Appeal the District Court's Denial of Bunchan's Request for a Continuance of the Sentencing Hearing*

Finally, Bunchan takes issue with his appellate counsel (Fox) for the latter's failure to raise an issue on direct appeal concerning the district court's denial of his request for a continuance of the sentencing hearing. Because this section 2255 claim is directed at appellate counsel, Bunchan must establish "that a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). In this, Bunchan faces an insurmountable hurdle. A defendant seeking to challenge (on direct appeal) the denial of a continuance at sentencing – as Bunchan claims Fox should have done – is required to make a showing that "the denial of the continuance was. . .arbitrary and substantially affected the defendant's ability to receive a fair sentence." Opp'n at 31, citing *United States v. Hedgepeth,* 418 F.3d 411, 423-24 (4th Cir. 2005). Faced with this demanding standard it was not unreasonable for Fox to present on direct appeal *other* issues which he determined to be stronger.[13] This last ground of the petition borders on the utterly frivolous.

## ORDER

For the foregoing reasons, Bunchan's motion to vacate, set aside, or correct his sentence is *DENIED*. The petition is *DISMISSED* with prejudice. The Clerk may now close the case.

---

[13] *See Bunchan*, 580 F.3d at 71-73.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE